IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MARY LOU GARCIA,**                              Case No. 1:16 CV 2682

      Plaintiff,

      v.                                          Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                              MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Mary Lou Garcia ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI in August 2013, alleging a disability onset date of August 15, 2013. (Tr. 151). Her claims were denied initially and upon reconsideration. (Tr. 92, 104). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 115). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on September 2, 2015. (Tr. 26-56). On November 2, 2015, the ALJ found Plaintiff not disabled in a written decision. (Tr. 12-22). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-4); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on November 3, 2016. (Doc. 1).

**FACTUAL BACKGROUND**

<u>Personal Background and Testimony</u>

Plaintiff was born in September 1963, making her 49 years old as of her alleged onset date, and 52 years old at the time of the ALJ's decision. *See* Tr. 156. She lived with her husband and fifteen-year-old son. (Tr. 34). Plaintiff had past work as a hotel housekeeper. (Tr. 38-39).

In September 2013, Plaintiff completed a function report, stating she had "no abilities . . . to work anywhere or with anyone." (Tr. 182). She claimed her "feet, legs[, and] hands [were not] functional". *Id.* In describing her daily activities, Plaintiff reported making coffee, getting her son up for school, "get[ting] mad and yell[ing] [be]cause the trash is not taken out", "[r]oll[ing] cig[arettes]", "try[ing] to do dishes" ("I'll start then my back goes out."), and watching the news. (Tr. 183). Plaintiff said she did not go anywhere, and could not be around people ("People are out to get me"). *Id.* She checked a box indicating she had "no problem" with personal care, but noted forgetting shower, and needing reminders to take medication. (Tr. 183-84). Plaintiff reported she could prepare her own meals. (Tr. 184) ("Cereal, sandwiches, pizza rolls, peanut butter sandwiches, corn dogs"). She reported that she cooked spaghetti "once in awhile" and that she did not cook "hardly at all". *Id.* Plaintiff reported she straightened the living room, and "tr[ied] to clean every day but . . . [could not] finish what [she] started." *Id.* Plaintiff stated she could not bend or lift, and reaching up caused her back to "go[] out." (Tr. 185). She reported her "mind starts going" and she gets so "frustrated that [she] can't do anything." *Id.* She indicated she went outside twice per week, and could drive or use public transportation. *Id.* She checked a box indicating she could go out alone. *Id.* She grocery shopped twice per month for around two hours. *Id.* Plaintiff reported watching television and reading as hobbies. (Tr. 186). Plaintiff stated she did not get along with her neighbors and had no friends. (Tr. 187). Plaintiff indicated she had difficulty with squatting,

bending, reaching, walking, seeing, memory, completing tasks, concentration, understanding, following directions, using her hands, and getting along with others. *Id.* Plaintiff reported difficulties with stress and changes in routine, as well as with authority figures. (Tr. 188). She reported using two arm braces, a TENS unit, and a back brace. *Id.*

At the September 2015 hearing, Plaintiff testified she stopped working in 2009 because she "got real sick", had back problems, and her psychologist told her she should not work. (Tr. 39). Plaintiff testified she was able to do housework "[s]ometimes." (Tr. 34). She testified that "every day is different", and that her son and husband helped. *Id.* ("If I can't do it, they'll have to get up and do it."). Plaintiff stated she did not cook. (Tr. 35). When asked why, she responded: "I just don't cook. I don't feel it. I don't know why. I haven't cooked in over a year probably, maybe even longer." *Id.* Plaintiff grocery shopped "[m]aybe once a month", getting everything the family needed after receiving the monthly food stamps; and she drove, "[s]ometimes" alone. (Tr. 36-37). When asked if she loaded the bags into the car, she said: "Not me, he does. I don't carry nothing." (Tr. 37). Her son put the groceries away. *Id.* She did not use a computer, but did watch television. (Tr. 38). Plaintiff only left the house to grocery shop and attend doctors' appointments. (Tr. 44).

Plaintiff testified she had been seeing Dr. Roheny for about six years. (Tr. 32). Prior to that, Plaintiff had seen a pain management physician, but stopped because she moved. (Tr. 32-33). Plaintiff testified to lower back pain that traveled down her right thigh. (Tr. 40). Plaintiff attributed her back pain to "making all those stupid beds at the hotel". (Tr. 43). She also testified to a feeling like "a million needles" underneath her feet and in her nose. (Tr. 40-41). She estimated she could sit for "[a]bout two hours" before she would need to get up and move; and stand for about an hour. (Tr. 42). She estimated she could walk for less than an hour, and stated she breaks to sit down while grocery shopping. (Tr. 42-43) ("Yeah, I have to. I'll be out of breath."). Plaintiff testified

the only recent treatment for her back problem was pain medication. (Tr. 47). She had back pain every day, but it fluctuated. *Id.*

Regarding her mental health, Plaintiff testified she had been seeing Dr. Bukuts for almost nine years. (Tr. 44).

Plaintiff had difficulty staying asleep, and typically got five to six hours of sleep per night. (Tr. 45). She got up at 6:30 a.m. to wake her son up. *Id.* On a good day, Plaintiff could "get up, get [her] son off to school, get [her] cats fed . . . and if [she] can try to get [her] house done, [her] housework done". (Tr. 46). Her house was small, only two bedrooms, and she had to take breaks to get the housework done. *Id.* On a bad day, Plaintiff got angry more easily. *Id.*

At the time of the hearing, Plaintiff was taking Topamax, methadone, and Percocet; she had recently stopped taking Xanax. (Tr. 41).

Relevant Medical Evidence

*Prior to Alleged Onset Date*

In March 2010, Plaintiff underwent an initial psychiatric evaluation with Katherine Proehl, N.D., C.N.S., at the Center for Families and Children. (Tr. 214-16). Plaintiff reported diagnoses of bipolar disorder, manic and depressive episodes, and stated she had been "on some medication in prison." (Tr. 214). Ms. Proehl assessed bipolar I disorder, noted Plaintiff's stressors were "moderate to severe" and assessed a Global Assessment of Functioning score of 49.[1] (Tr. 216).

---

1. The GAF scale represented a "clinician's judgment" of an individual's symptom severity or level of functioning. Am. Psych. Ass'n, *Diagnostic & Statistical Manual of Mental Disorders,* 32–33 (4th ed., Text Rev. 2000) ("*DSM-IV-TR*"). "The most recent (5th) edition of the Diagnostic and Statistical Manual of Mental Disorders does not include the GAF scale." *Judy v. Colvin,* 2014 WL 1599562, at *11 (S.D. Ohio); *see also* Diagnostic and Statistical Manual of Mental Disorders 16 (5th ed. 2013) ("DSM-V") (noting recommendations "that the GAF be dropped from [DSM-V] for several reasons, including its conceptual lack of clarity ... and questionable psychometrics in routine practice"). However, as set forth in the DSM—IV, a GAF score between 41 and 50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent

In May 2012, Plaintiff saw James Bukuts, M.D., twice. (Tr. 239-40). He noted Plaintiff was "[s]till dealing with ongoing stress" regarding her daughter, who also had mental health problems. (Tr. 240). He noted no psychosis, a diagnosis of bipolar disorder, and continued Plaintiff's medications. (Tr. 239-40). The next month, Plaintiff again reported "ongoing family issues" and a viral infection. (Tr. 238). Dr. Bukuts again continued Plaintiff's medications, and noted Plaintiff should be "follow[ed] closely." *Id.* In July, Dr. Bukuts noted Plaintiff had suffered a death in the family, and would be away, and need additional medications. (Tr. 237). He continued Plaintiff's medication. *Id.*

Plaintiff did not show for her September 2012 appointment. (Tr. 236). In October, Plaintiff reported she was getting married, and back from California. (Tr. 234). She was compliant with medications, and Dr. Bukuts noted her "[s]tress was up but predictable" and that she had "increased stress but [was] coping". (Tr. 234-35). He noted Plaintiff made some progress toward goals, and should continue her current treatment plan and medications. (Tr. 235). Plaintiff did not show for her December 2012 appointment. (Tr. 233).

In November 2012, Plaintiff saw neurologist Deepak Raheja, M.D., reporting difficulty focusing, anxiety, depression, and insomnia. (Tr. 211). On mental status examination, Dr. Raheja noted: "[n]ormal orientation, memory, concentration, language, fund of knowledge." *Id.* Plaintiff's motor examination was also normal. *Id.* Dr. Raheja assessed attention deficit disorder of childhood, without mention of hyperactivity, anxiety, pseudobulbar affect, and insomnia. *Id.* She prescribed Ambien, Nuedexta, and "neuro stimulants for the symptoms of ADD." *Id.* In December 2012, Plaintiff reported "feeling tired and fatigued all the time" and reported "good days and bad days".

---

shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job.)". *DSM-IV-TR* at 34.

(Tr. 210). Dr. Raheja's examination was normal, and she continued Plaintiff's medications. *Id.* Plaintiff returned in January 2013, reporting "difficulty focusing and staying on task" and anxiety. (Tr. 209). Her mental status was "[a]lert and oriented to time, place and person" and her attention span, concentration, mood, affect, memory, and speech were normal. *Id.* Her physical examination was also normal. *Id.* Plaintiff's medications were continued. *Id.*

In January 2013, Dr. Bukuts noted Plaintiff was "stable", "possibly perimenopausal and moody". (Tr. 231). Plaintiff missed her February 2013 appointment. (Tr. 230). In March, Plaintiff was "stable in spite of a lot of stress in her family". (Tr. 228). In both January and March, Dr. Bukuts again assessed some progress, and noted under treatment recommendations: "same/follow closely" (Tr. 229, 232), and that Plaintiff was compliant with her medications (Tr. 228, 231). Later in March, Plaintiff had an add-on appointment "because her meds were stolen last week." (Tr. 225). Dr. Bukuts noted anxiety and depression, and that Plaintiff was "[s]lightly better since being on the ADHD meds" (which had been prescribed by a neurologist at Grace Hospital). *Id.* Plaintiff had been off Xanax and Ambien for a week, with limited withdrawal symptoms. *Id.* Her medication compliance was noted to be "[p]artial", and she had made some progress. (Tr. 225-26). Dr. Bukuts advised Plaintiff to "resume prior meds but Xanax at lower dose since anxiety is better". (Tr. 226).

In April 2013, Dr. Bukuts "left a message to call the Centers to review her meds." (Tr. 224). At an appointment two days later, Plaintiff had a "[h]igh level of stress and used the session to vent." (Tr. 222). Plaintiff reported she was no longer going to Grace Hospital because of a "bad customer service interaction" and was "off the vyvanase and nudextra". *Id.* Plaintiff was adherent to her medications, which Dr. Bukuts instructed her to maintain, and noted he would "follow closely in light of the current stressors". (Tr. 223).

In May 2013, Plaintiff again "[d]iscussed various issues . . . primarily related to her [daughter] and her legal issues". (Tr. 220). Dr. Bukuts noted Plaintiff reported anxiety, depression, and panic attacks, explaining: "steadily increasing over the last 2 months with building process that she has/feels that she has no active support or help outside of teenage son". *Id.* Dr. Bukuts noted: "With added stress she has been cutting[,] which is a behavior she hasn't done in years." *Id.* Dr. Bukuts assessed "[g]lobally worsened [symptoms] with depression, anxiety, and self injurious behavior". (Tr. 221). He also noted Plaintiff had "self discontinued Topamax" due to a "lack of clear benefits". *Id.* She "[r]emain[ed] on nudextra from another physician she is no longer seeing" and Dr. Bukuts recommended she "stop since she wasn't taking it for an approved indication." *Id.* He noted "[p]artial" compliance with medications. (Tr. 220).

Later in May 2013, at a nursing visit, Plaintiff reported that she and "her husband ha[d] been working on their problems". (Tr. 276). She was compliant with medications, and reported Trazadone "has helped her sleep" and "Xanax is also working well." *Id.* At the next visit one week later, Plaintiff reported she "still ha[d] anxiety" and was "bothered by her husband's friends calling her cell phone". (Tr. 277). She requested a counselor, and noted she did not mind "coming in for weekly pill minders." *Id.* She noted she "fe[lt] better coming [to the Centers for Families and Children] and feels like she is not crazy". *Id.* She was compliant with her medications. *Id.* In mid-June, Plaintiff was "changed to two week pill minders" and was "looking forward to meeting with her counselor very soon". (Tr. 279). At the end of June, Plaintiff's mood was "ok but not great" and she was "[a]nxious to meet with her case worker ASAP." (Tr. 281). Plaintiff returned two weeks later for her routine pill minder appointment. (Tr. 282). In July 2013, Plaintiff arrived early for her appointment with Dr. Bukuts, and then left before the appointment time. (Tr. 219).

*After Alleged Onset Date*

In August 2013, Dr. Bukuts noted Plaintiff had last been seen two months prior, but "has had close follow up with nursing and CPST", and had remained compliant with medications. (Tr. 217). Plaintiff reported "ongoing stressors and increased anxiety" and wanting "a higher dose of xanax." *Id.* Dr. Bukuts recommended counseling to increase coping skills. *Id.* Plaintiff was compliant with her medications (Tr. 217), and Dr. Bukuts noted "[m]inimal [p]rogress" and assessed "[s]low improvement with understanding her [mental illness]". (Tr. 218). He also "educated [Plaintiff] further about the long term plan with getting her of[f] her controlled substances". *Id.* In September, Plaintiff reported improved sleep, and "mild benefits with depression and anxiety" with Trazodone. (Tr. 287). She was compliant with her medications, making "some" progress, and Dr. Bukuts noted Plaintiff had "added stress with getting her meds over the past 2 months" and she "remain[ed] on board with reducing her controlleds long term" (Tr. 288). He stated he would "hold off reducing the Xanax or ambien for now[,] but will at the next visit as we increase the trazodone further". *Id.*

In October, Plaintiff reported her stress was "low". (Tr. 289). She was compliant with her medications, making "some" progress, and Dr. Bukuts continued Plaintiff's medications. (Tr. 290). In November, Plaintiff's "overall stress level ha[d] been better over the past month and [she] notice[d] less issues with depression, anxiety, panic attacks." (Tr. 291). Dr. Bukuts educated Plaintiff about her medication "with the focus of using the trazodone as her main med so the xanax and the ambien can be phased out." *Id.* Plaintiff was medication compliant, and Dr. Bukuts revised her diagnosis from bipolar disorder to chronic adjustment disorder with mixed features of depression and anxiety. (Tr. 292). He noted "slight global improvement of [symptoms] with trazodone". *Id.*

In December, Dr. Bukuts noted Plaintiff was "still handling the stress better with the addition of trazodone to manage her anxiety and mood", and her "sleep remain[ed] improved". (Tr. 294). She had "[i]ncreased stress with other family living with her temporarily" but was "handling [it] better than she thought". *Id.* Dr. Bukuts assessed no change in Plaintiff's progress, noted medication compliance, instructed Plaintiff to "[m]aintain same meds" and noted he would "look at other helpful ADs on the other side of the holidays so eventually we can get her off the Xanax." (Tr. 295). He again noted "slight global improvement of symptoms with trazodone". *Id.*

In January 2014, Dr. Bukuts again noted medication compliance, "[m]inimal" progress, and that the "plan [was] eventually to completely eliminate or infrequent use of controlled substances". (Tr. 297). Plaintiff "misunderstood the directions at her last visit and went off the trazodone". (Tr. 296). He instructed Plaintiff to "[m]aintain same meds and resume trazodone". *Id.* In February, Plaintiff reported "limited issues handling the decrease in the ambien". (Tr. 300). She again reported increased stress "and issues with the cold weat[h]er" but was "handling it better than she thought." *Id.* Dr. Bukuts made similar comments as before: there was no change in Plaintiff's progress, she should continue her medications, and she had a "slight global improvement of symptoms with trazodone". (Tr. 301).

In March 2014, Plaintiff reported "no further improvement with sleep or irritability through the day but appears to [be] more related to being perimenopausal." (Tr. 302). Plaintiff also reported sleep difficulty, but Dr. Bukuts noted this "appear[ed] to be a function of poor sleep hygiene with the culprit being the TV." *Id.* Plaintiff's stress was "up" but she was "managing better than the past". *Id.* Dr. Bukuts noted medication compliance, minimal progress, and continued Plaintiff's medications. (Tr. 303). In April, Plaintiff reported she was doing well. (Tr. 304). Dr. Bukuts noted medication compliance, and "limited dry mouth that occurred with the higher dose of the

trazodone". (Tr. 305). He instructed Plaintiff to continue the same medications, and noted her primary care physician was slowly weaning her off Percocet. *Id.* In May, Plaintiff reported: "Things are so-so" and reported stressors regarding "her children and their issues that are focused around their legal issues". (Tr. 306). Dr. Bukuts assessed some progress, noted medication compliance, and maintained Plaintiff on her medications. *Id.*

In June 2014, Dr. Bukuts noted no change, medication compliance, and continued Plaintiff's medications. (Tr. 308-09). In August, Dr. Bukuts noted Plaintiff had "the positive focus of her youngest who is doing well and looking forward to school." (Tr. 310). He noted medication compliance, some progress, and maintained Plaintiff's medications. (Tr. 311). In September, Plaintiff reported a problem with bedbugs but believed it had been resolved. (Tr. 312). Dr. Bukuts again noted medication compliance, some progress, and maintained Plaintiff's medications. (Tr. 313). Notes from November and December are similar. (Tr. 314-17).

The next note in the record from Dr. Bukuts is from April 2015. (Tr. 325-26). Dr. Bukuts noted he had last seen Plaintiff "3 months ago because of scheduling issues". (Tr. 325). Plaintiff reported "some improvement with sleep and irritability through the day" and increased stress "but managing better than in the past." *Id.* Dr. Bukuts noted medication compliance, assessed some progress, and maintained medications. *Id.* He noted he would "again increase the trazodone to make it easier to slowly come off of the xanax and ambien." (Tr. 326). The following month, Plaintiff had "moderate [symptom] impairment" but she was "tolerating the recent decrease in the xanax 2 weeks ago." (Tr. 327). Dr. Bukuts assessed minimal progress, and noted medication compliance. (Tr. 327-28). He noted he would "again increase the trazodone" and would "continue the theme in reduction in Xanax by ½ pill per at least every 2 weeks and then with nursing support with in between appointments." (Tr. 328). He noted that then he would "move forward with

elimination of ambien". *Id.* Dr. Bukuts also "commended [Plaintiff] on setting better priorities with taking more active responsibility of her daily affairs". *Id.*

In August 2015, Dr. Bukuts found Plaintiff had "moderate to severe" symptoms "with very limited coping skills and impulse control." (Tr. 339). However, Plaintiff stated she was "remaining positive by keeping herself busy" despite drama in her apartment building. *Id.* He assessed minimal progress, noted Plaintiff was "now off of xanax and trazodone as she did not see the trazodone as being helpful" and was still taking Ambien. (Tr. 341). Dr. Bukuts noted he would "educate around other possible more appropriate med options" and resumed Topamax, which Plaintiff reported had "some benefits for anxiety and sleep". *Id.*

Pharmacy records from December 2013 through June 2015 show Plaintiff was prescribed, *inter alia*, methadone and oxycodone by Dr. Nader Roheny. (Tr. 331-36).[2]

*Opinion Evidence*

In November 2013, Plaintiff underwent a consultative psychological examination with psychologist Michael Faust, Ph.D. (Tr. 243-49). On mental status examination, Dr. Faust noted Plaintiff was cooperative, "but exhibited an irritable affect and depressed mood"; Dr. Faust found rapport "difficult to establish because of her agitation, anxiety and depressed mood." (Tr. 246). Plaintiff "had no difficulty understanding questions or instructions", but her "level of attention/concentration throughout the interview was variable in that she struggled to stay focused and lost her train of thought while performing mental status tasks." *Id.* She, did, however, "attend[] to the conversation without observable difficulty." *Id.* Plaintiff had "a constricted range of emotions, and blunted affect"; "She was anxious and her voice trembled." *Id.* Plaintiff was alert and oriented, her thinking "was reality bound", and she was estimated to be functioning within the

---

2. Dr. Roheny's treatment notes are not part of the record.

average range of intelligence." (Tr. 247). She was able to perform serial 7s "slowly, but after six numbers, she became confused and lost her train of thought." *Id.* "She completed 7 digits forward and 3 backward, indicating impairment in sustained concentration." *Id*. Dr. Faust stated Plaintiff "demonstrated good insight and judgment into her situation". *Id.* Regarding her daily activities, Plaintiff reported "variable sleeping patterns depending on her mood." *Id.* She was "able to complete chores and hygiene", and "[f]or recreation, she watches television and occasionally, she will bake." *Id.* Dr. Faust assessed bipolar II disorder, anxiety disorder, and personality disorder; he assessed a GAF score of 60.[3] *Id.* Regarding Plaintiff's work-related mental abilities, Dr. Faust opined that "[w]hile she can understand all instructions, she may have difficulty recalling specific task instructions in order to complete work tasks due to lapses in attention." (Tr. 248). He noted she had a "mild impairment in sustained concentration", "mild attention problems", and noted that although she "report[ed] difficulty staying on task at home because of distractibility . . . work pace was within normal limits here today." *Id.* Dr. Faust thought Plaintiff's "mood swings and anxiety would impact upon her ability to interact with others" and that "[e]xposure to work pressures may increase her bipolar and anxiety symptoms and she does not have effective coping skills to manage emotional outbursts or mood swings." (Tr. 249).

Also in November 2013, Plaintiff underwent a consultative internal medicine examination with Dr. Assaf. (Tr. 252-60). Dr. Assaf noted Plaintiff was "uncooperative" and stated "her illness is more mental than physical and that she does not understand why she had to come for this examination." (Tr. 252). Plaintiff reported her back pain started with a car accident seven years

---

3. A GAF score of 51–60 "indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Kornecky v. Comm'r of Soc. Sec.,* 167 F. App'x 496, 503 (6th Cir. 2006) (citing *DSM-IV-TR*).

prior, the pain was 8-9/10, and constant. *Id.* She reported worsening with movement, standing, walking, bending, and lifting. *Id.* She was taking Percocet and methadone, "which help only very little with her pain." *Id.* Plaintiff also reported pain and numbness in both hands, "especially at night and with overuse of her hand." *Id.* She also reported mental health issues, and that "her symptoms have improved on treatment." (Tr. 253). Regarding her activities, Plaintiff reported cooking twice per week, cleaning once per week, laundry once per week, shopping once per week, and showering twice per week. *Id.* She did dress herself daily. *Id.* On examination, Dr. Assaf noted Plaintiff was in no acute distress, had a normal gait, could toe and heel walk without difficulty, needed no help getting on and off the exam table, and was able to rise from her chair without difficulty. (Tr. 254). Her squat was "limited to 50 degrees." *Id.* On musculoskeletal examination, Dr. Assaf noted: "No scoliosis, kyphosis, or abnormality in thoracic spine. SLR is positive on the left at 30 degrees. No evidence subluxations, contractures, ankyloses, or thickening. Joints stable and nontender. No redness, heat, swelling, or effusion." (Tr. 255). For his medical source statement, Dr. Assaf reported "There are moderate limitations in activities requiring prolonged standing, walking, bending, and lifting." (Tr. 256). He also referred to the attached range of motion form, which showed normal range of motion in the cervical spine, shoulders, elbows, wrists, hands, fingers, hips, knees, and ankles, but reduced range of motion in flexion and extension of the dorsolumbar spine. (Tr. 258-60).

Later in November 2013, state agency medical consultant Gary Hinzman, M.D. reviewed Plaintiff's records. (Tr. 88, 91). He concluded Plaintiff had the physical residual functional capacity to perform medium work, and adopted the prior ALJ's RFC. (Tr. 88, 91). In December 2013, state agency psychologist Carl Tishler, M.D., reviewed Plaintiff's records. (Tr. 86). He similarly adopted the prior ALJ's mental RFC determination. (Tr. 88-89).

In February 2014, state agency physician Esberdado Villanueva, M.D. and state agency psychologist Deryck Richardson, Ph.D., reviewed Plaintiff's records. (Tr. 100-01). They again adopted the prior ALJ's RFC determination. *Id.*

In February 2015, Dr. Bukuts completed a mental capacity assessment form. (Tr. 320-21). He opined Plaintiff could occasionally[4]: follow work rules, use judgment, maintain attention and concentration for to hour segments, deal with the public, function independently without redirection, and complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 320). Dr. Bukuts opined Plaintiff could frequently[5] maintain regular attendance and be punctual, but only rarely[6]: interact with supervisors, work in coordination with or proximity to others without being distracted or distracting, and deal with work stress. *Id.* Dr. Bukuts thought Plaintiff could only occasionally understand, remember and carry out complex, or detailed job instructions, but she could frequently understand, remember, and carry out simple job instructions. (Tr. 321). He opined Plaintiff could frequently maintain her appearance, or leave home on her own, but could only occasionally socialize, behave in an emotionally stable manner, relate predictably in social situations, or manage funds or schedules. *Id.* He noted he had seen Plaintiff for "6-7 years" and as the "diagnosis and symptoms that support this assessment", listed "Major Depressive Disorder. *Id.*

VE Testimony

A VE appeared and testified at the hearing. (Tr. 50-56). The VE testified Plaintiff's past work as a hotel housekeeper was "light as performed". (Tr. 51). The ALJ then asked the VE to

---

4. "Occasional" was defined as "ability for activity exists for up to 1/3 of a work day". (Tr. 320).
5. "Frequent" was defined as "ability for activity exists for up to 2/3 of a work day". (Tr. 320).
6. "Rare" was defined as "activity cannot be performed for any appreciable time". (Tr. 320).

assume an individual with Plaintiff's age, education and past relevant work experience with the

RFC:

> For medium work, except there is a requirement for simple to multi-step tasks where changes are infrequent and fully explained, and where there are no strict production quotas, and only brief and superficial interactions with supervisors, coworkers, and the public.

(Tr. 52). The VE testified such an individual could perform Plaintiff's past work. (Tr. 53).

Plaintiff's counsel then asked the individual to assume an individual with the same physical

limitations, but added:

> No contact with supervisors, and only occasional and superficial contact with coworkers and the general public . . . [and] [i]n terms of working in coordination with or proximity to other people she could only do that rarely, which is defined as cannot be performed for any appreciable time. Same for dealing with work stress.

*Id.* The VE testified such an individual could not perform Plaintiff's past work, or any work. *Id.*

Plaintiff's attorney then asked the VE to consider a person with "moderate limitations and

prolonged standing, walking, bending, and lifting, so that is the extent of the restrictions that I

have. I cannot quantify them beyond that." (Tr. 54). The VE testified such an individual with such

restrictions could not perform past work, and would be limited to sedentary work. (Tr. 54-55).

ALJ Decision

In her written decision, the ALJ found Plaintiff had not engaged in substantial gainful

activity since her application date. (Tr. 14). She found Plaintiff had severe impairments of chronic

low back pain, affective disorders, anxiety disorder, and personality disorders, but that her

impairments—either individually or in combination—did not meet or medically equal a listed

impairment. (Tr. 14-15). Applying the rule from *Drummond v. Comm'r of Social Security*, 126

F.3d 837 (6th Cir. 1997), the ALJ concluded Plaintiff had shown no material evidence of

worsening since a prior ALJ decision (Tr. 64), and thus she retained the residual functional capacity:

> to perform medium work as defined in 20 CFR 416.967(c) except she requires simple to multi-step tasks where changes are infrequent and fully explained. She can work where there are no strict production quotas, with brief and superficial interactions with supervisors, coworkers, and the public.

(Tr. 16-17). The ALJ then concluded Plaintiff was capable of performing past relevant work as a hotel/motel housekeeper/cleaner, and therefore was not disabled. (Tr. 21-22).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1.    Was claimant engaged in a substantial gainful activity?

2.    Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.    Does the severe impairment meet one of the listed impairments?

4.    What is claimant's residual functional capacity and can claimant perform past relevant work?

5.    Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff alleges the ALJ failed to appropriately weigh the medical opinions of record, and that the residual functional capacity determination is not supported by substantial evidence. Within her second assignment of error, Plaintiff also challenges the ALJ's credibility determination. The

Commissioner responds that the ALJ's did not err, and her decision is supported by substantial evidence and should be affirmed. For the reasons discussed below, the undersigned affirms the decision of the Commissioner.

Medical Opinion Evidence

Plaintiff contends the ALJ "never performed the required analysis to determine if Dr. Bututs was a "treating source" and "wrongly rejected the report and opinion of the agency's own consultative examiners Dr. Assaf and Dr. Faust." (Doc. 13, at 11).[7]

Under the regulations, there exists a hierarchy of medical opinions: first, is a treating source whose opinion is entitled to deference because it is based on an ongoing treatment relationship; second, is a non-treating source, which are those medical sources who have examined but not treated the Plaintiff; and lastly, is a non-examining source, those who render opinions based on a review of the medical record as a whole. 20 C.F.R. § 416.902.

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96–2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective

---

7. Although in this sentence, Plaintiff appears to challenge the ALJ's evaluation of Dr. Faust's opinion, she offers no developed argument in this regard. Rather, Plaintiff merely notes that Dr. Faust's opinion supports the opinion the treating physician. *See* Doc. 13, at 13. Because underdeveloped arguments are waived, the undersigned does not separately address the ALJ's treatment of Dr. Faust's opinion. *See McPherson v. Kelsey,* 125 F.3d 989, 995-96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones.") (citation and internal quotation omitted).

medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers,* 486 F.3d at 242.

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id.* (citing *Wilson v. Comm'r of Soc. Sec.,* 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 416.927(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship—length, frequency, nature and extent; (3) supportability—the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. *Id.*; *Ealy v. Comm'r of Soc. Sec.,* 594 F.3d 504, 514 (6th Cir.2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.,* 561 F.3d 646, 651 (6th Cir.2009), but failure to provide any reasoning requires remand. *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 409–10 (6th Cir.2009).

*Treating Physician – Dr. Bukuts*

First, Plaintiff contends the ALJ never performed the required analysis to determine if Dr. Bukuts's opinion was entitled to controlling weight, and did not provide a proper analysis of that opinion. The undersigned disagrees.

The ALJ recognized Dr. Bukuts's treating physician status. *See* Tr. 20 ("the undersigned gives little weight to the opinions of treating provider James Bukuts, M.D., who opined . . ."). And, the ALJ found Dr. Bukuts's opinion was not supported by the evidence, and her decision to give that opinion less than controlling weight (and, in fact, "little weight"), touched upon several factors an ALJ is required to consider under the regulations. 20 C.F.R. § 416.927; *Ealy*, 594 F.3d at 514. And those reasons were supported by substantial evidence.

The ALJ first explained that Dr. Bukuts's opinion was "not supported by the record, given the fact that Dr. Bukuts's own progress notes tends to reflect issues with family and legal issues rather than underlying mental impairments." (Tr. 20) (citing Tr. 276). This is supported by substantial evidence. While Dr. Bukuts's treatment notes refer to stress regarding Plaintiff's family issues, *see, e.g.*, Tr. 222, 228, 234-35, 238, 240, 294, 300, they also frequently note Plaintiff was "stable" or dealing well with the stress, *see, e.g.,* Tr. 225 ("[s]lightly better since being on the ADHD meds"); Tr. 226 ("Xanax at lower dose since anxiety is better); Tr. 228 ("stable in spite of a lot of stress in her family"); Tr. 231 ("stable"); Tr. 235 ("increased stress but coping"); Tr. 276 ("Trazadone has helped her sleep. Xanax is also working well."); Tr. 287 (reporting improved sleep and "mild benefits with depression and anxiety"); Tr. 289 ("Stress is low"); Tr. 291 ("overall stress level has been better over the past month and notices less issues with depression, anxiety, panic attacks"); Tr. 292 ("slight global improvement of [symptoms] with trazodone"); Tr. 294 ("still handling the stress better with the addition of trazodone to manage her anxiety and mood"); Tr. 300 ("handling [stress] better than she thought"); Tr. 304 ("I'm doing good."); Tr. 325 ("some improvement with sleep and irritability through the day" and "Stress is up but managing better than in the past."). Additionally, Dr. Bukuts's treatment notes show generally conservative treatment, with few medication changes, as well as efforts to wean Plaintiff off some medications.

*See* Tr. 327, 328, 341. Thus, although Plaintiff saw Dr. Bukuts regularly for medication refills, his notes do not support restrictions as extreme as those to which he opined. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 631 (6th Cir. 2016); *see also, e.g., Lester v. Soc. Sec. Admin.*, 596 F. App'x 387, 389 (6th Cir.2015) (finding the ALJ reasonably discounted a doctor's proposed limitations because, among other things, the claimant was receiving conservative treatment).[8]

Next, the ALJ explained that Dr. Bukuts "provided little to no treatment notes to support his opinion and instead relied on a check the block form with little explanation." (Tr. 20). The Sixth Circuit has found this a valid reason giving less weight to a medical opinion. *See Ellars v. Comm'r of Soc. Sec.*, 647 F. App'x 563, 567 (6th Cir. 2016) (holding that "the administrative law judge properly gave a check-box form little weight where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence"); *see also Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) ("[T]he ALJ is not bound by conclusory statements of doctors, particularly where there are unsupported by detailed objective criteria and documentation.") (internal citations and quotations omitted); *Mason v. Shalala*, 994 F.2d 1058, 1065–66 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best. ... [W]here these so-called reports are unaccompanied by thorough written reports, their reliability is suspect.") (internal citations and quotation marks

---

8. Although Plaintiff argues the ALJ "ignore[d] the report of Dr. Bukuts that Ms. Garcia's condition worsened in 2013 and resulted in her cutting herself" (Doc. 13, at 13), an ALJ is not required to discuss every piece of evidence in the record, *see Boseley v. Comm'r of Soc. Sec.*, 397 F. App'x 195, 199 (6th Cir. 2010) ("Neither the ALJ nor the Council is required to discuss each piece of data in its opinion, so long as they consider the evidence as a whole and reach a reasoned conclusion."). Further, the single record Plaintiff cites pre-dates the alleged onset date, *see* Tr. 220-21 (May 2013 treatment note), and Plaintiff points to no additional evidence in the record to suggest the behavior continued.

omitted); 20 C.F.R. § 416.927(c)(3) ("The better an explanation source provides for an opinion, the more weight we will give that opinion.").

Finally, the ALJ stated Dr. Bukuts's conclusions "appear[ed] extreme given the fact that claimant has had some good objective examination findings, such as being alert and oriented times four, normal speech, normal affect, good memory, good judgment, good insight, no suicidal or homicidal ideations, and no indication of hallucinations, delusions, or paranoia." (Tr. 20) (citing Tr. 246-47 (November 2013 consultative examination); Tr. 255 (November 2013 physical consultative examination in which Dr. Assaf noted an unremarkable mental status examination).

As a whole, the undersigned finds the ALJ's reasons were "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544. The ALJ recognized Dr. Bukuts's treatment relationship with Plaintiff, and considered the consistency and supportability of his opinion; this is sufficient. *See Henke v. Astrue,* 498 F. App'x 636, 641 n.3 (6th Cir. 2012). And, as discussed above, her analysis is supported by substantial evidence in this regard. This is so even though Plaintiff can point to contrary evidence because this Court must affirm even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

*Consultative Examiner – Dr. Assaf*

Second, Plaintiff contends the ALJ erred "in rejecting the opinion of Dr. Assaf that [Plaintiff] had 'moderate limitations in activities requiring prolonged standing, walking, bending and lifting.'" (Doc. 13, at 13) (citing Tr. 256). Again, the undersigned disagrees. First, the ALJ did not "reject" Dr. Assaf's opinion, but rather gave it "some weight". (Tr. 20). She explained:

> Dr. Assaf is a highly trained medical provider who had the opportunity to personally observe and examine the claimant. However, Dr. Assaf's limitations are

somewhat vague and the doctor also appears to have relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported. Furthermore, the objective evidence, showed the claimant maintaining normal findings during examination, such as no scoliosis, no kyphosis, no abnormality in the thoracic spine, normal gait, no redness, no heat, no swelling, no effusion, stable joints, normal deep tendon reflexes, normal strength in the upper and lower extremities, can walk on heels and toes without difficulty, and appeared to be in no acute distress (B4F/4-5, 7).

(Tr. 20). While Plaintiff is correct that Dr. Assaf's examination showed some decreased range of motion in the lumbar spine (Tr. 259), and a positive straight leg raising test on the left (Tr. 255), the remainder of the findings were largely, as the ALJ noted, normal. *See* Tr. 257-60. And, it is not as though the ALJ ignored the positive findings, as she described and cited them earlier in her decision. (Tr. 18) ("Exams showed positive straight leg raise test on the left, decreased flexion and extension in the dorsolumbar spine, and decreased sensation to light touch over the left leg.") (citing Tr. 255, 259).

Moreover, the ALJ discounted Dr. Assaf's opinion in part due to vagueness. His entire medical source statement read: "There are moderate limitations in activities requiring prolonged standing, walking, bending, and lifting." (Tr. 266). Dr. Assaf did not define either the word "moderate" or the word "prolonged." *Id.* Plaintiff contends the ALJ should have interpreted the word "moderate" as it is "most commonly ascribed in the social security disability setting, it would mean that such an individual could occasionally perform an[] activity." (Doc. 13, at 14). However, Plaintiff provides no authority requiring the ALJ to do so. And other courts have found such an opinion to be too vague. *See, e.g.*, *Larock v. Comm'r of Soc. Sec.*, 2016 WL 1697621, at *7 (N.D.N.Y) ("To be sure, Dr. Lorensen failed to provide a function by function analysis and her opinion that Plaintiff had 'moderate' limitations in walking, without more, was vague[.]"), *report and recommendation* adopted 2016 WL 1700408; *Ubiles v. Astrue*, 2012 WL 2572772, at *11

(W.D.N.Y.) (holding that a consultative examiner's opinion that the plaintiff had "moderate limitations in standing, walking, climbing stairs, and lifting minor weights" was "entirely too vague to serve as a proper basis for an RFC"); *see also Allison v. Colvin*, 2017 WL 445231, at *2-3 (W.D.N.C) ("First as the Magistrate Judge noted, 'moderate' is not a vocational term as it relates to the RFC. Thus, the ALJ must take that generic statement and incorporate it into an RFC determination which is what the ALJ did here. Regardless, by their plain meanings moderate and medium are not contradictory words, and in this context seem close to synonymous.").[9]

Next, the ALJ noted Dr. Assaf "seemed to uncritically accept as true most, if not all, of what the claimant reported". (Tr. 22). Plaintiff contends this is error, noting that Dr. Assaf did not impose any restrictions on Plaintiff's ability to use her hands, despite her report of pain and numbness. (Doc. 13, at 14) (citing Tr. 252). And, Plaintiff points out, Dr. Assaf's objective examination showed a loss of range of motion in the lumbar spine, and a positive straight leg test. *Id.* (citing Tr. 255, 259). The undersigned finds, however, that even if this reason lacks support in the record, it is harmless because the ALJ's other reasons provide substantial evidence.

Further, there is no additional evidence—either diagnostic or treatment—that provides a basis for greater physical limitations than found by the ALJ.[10] Moreover, state agency physician Dr. Hinzman noted the positive findings from the Dr. Assaf's examination, *see* Tr. 85-86 (noting "11/2013 IM CE" showed "Decreased ROM in spine. SLR positive on the lt. Joint stable.

9. Additionally, Plaintiff points to the VE's testimony that if a person were so limited, that person would be limited to sedentary work. *Id.* (citing Tr. 54-55). But an ALJ is only required to incorporate in the RFC those limitations he finds credible, *see Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993), and the ALJ here did not adopt in full Dr. Assaf's opinion. Therefore the VE's response to counsel's question is not relevant here.
10. The only additional evidence regarding Plaintiff's back impairment are her prescription records, and her subjective reports. But the pharmaceutical records, without more, provide no specific limitations on Plaintiff's abilities, and as discussed below, the undersigned concludes the ALJ properly discounted Plaintiff's subjective reports some degree.

Decreased sensation to light touch over the lt leg."), and still concluded Plaintiff was capable of medium exertional work as the ALJ ultimately found, Tr. 88. It is Plaintiff's burden to prove her RFC. 20 C.F.R. § 416.945(a)(3); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999). Thus, the ALJ's decision to discount Dr. Assaf's opinion to some degree—and thus the overall physical RFC determination—is supported by substantial evidence in the record and is affirmed.

*State Agency Reviewers*

Plaintiff also challenges the ALJ's decision to give great weight to the state agency reviewing physicians, pointing out that their opinions were issued without the benefit of the entire record. Specifically, she notes that the reviewing physicians "did not have benefit of reviewing the pharmaceutical records documenting use of Methadone and Percocet for pain control or the opinion of treating psychologist, Dr. Bukuts." (Doc. 13, at 16). However, an ALJ may give an opinion great weight even though it is earlier in time, so long as the ALJ considers the record as a whole. *See Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 248 (6th Cir. 2016) (finding no error in giving great weight to an earlier state agency reviewing physician opinion when "the ALJ's own analysis clearly spanned the entire record"). Furthermore, state agency reviewing physicians are considered experts, and their opinions may, at times, be entitled to greater weight than treating or examining physicians when the opinions are supported by the evidence. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) ("State agency medical consultants ... are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act"; thus, in some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating ... source.") (internal quotation marks omitted). Here, the ALJ's analysis spanned the entire record, and was supported

by the record, so her decision to give great weight to the earlier state agency opinions was not error.

Credibility

When making a credibility finding, the ALJ must make a finding based on a consideration of the entire record. SSR 96-7p, 1996 WL 374186, *1. But, an ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1.

With regard to a claimant's subjective symptoms, the regulations require an ALJ to consider certain factors, including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain; 6) any measures used to relieve pain; and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 416.929(c); SSR 96-7p, 1996 WL 374186, at *3 ("20 CFR . . . 416.929(c) describe[s] the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements").[11] Although the ALJ must "consider" the

---

11. Subsequent to the date of the ALJ's decision, the Social Security Administration issued new Social Security Ruling 16-3p, which supersedes Social Security Ruling 96-7p. The Sixth Circuit characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' . . . to 'clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Ec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016). The Social Security Administration has stated SSR 16-3p is not to be applied retroactively. 82 Fed. Reg. 49462, 49468

listed factors, there is no requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

Accordingly, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004) (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)). The ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Id.* (citing *Walters*, 127 F.3d at 531). In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully supported, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 780 (6th Cir. 1987); *see also Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011) (an ALJ's credibility assessment may only be disturbed for a "compelling reason"). In fact, as the Sixth Circuit has stated that an ALJ's credibility findings "are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted).

---

n.27 (Oct. 25, 2017), available at https://www.gpo.gov/fdsys/pkg/FR-2017-10-25/pdf/2017-23143.pdf.

Here, the ALJ appropriately cited the regulation regarding symptoms, and described the two–step process. (Tr. 17) (citing 20 C.F.R. § 416.929). She determined Plaintiff's impairments could reasonably be expected to cause her "some of the symptoms of the types alleged", but that "her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision". (Tr. 18). The ALJ then provide several rationales for discounting Plaintiff's credibility: 1) the record failed to "fully substantiate the allegations of disabling [physical] symptoms"; 2) the objective mental health findings on record support better functioning than Plaintiff asserted; 3) Plaintiff activities of daily living suggested she was not as limited as alleged; 4) Plaintiff had "not been entirely compliant in following prescribed treatment"; and 5) Plaintiff's "receipt of conservative treatment." (Tr. 18-19).

Preliminarily, the undersigned agrees with Plaintiff that the ALJ's reasoning regarding treatment noncompliance is not supported by substantial evidence. While the ALJ stated that "there is evidence the claimant has not been entirely compliant in following prescribed treatment, which suggests that the symptoms may not have been as limiting as the claimant has alleged . . ." (Tr. 19), the records cited are not fully supportive of this statement. *See* Tr. 220-21 (May 2013 notation of "partial" medication compliance and that Plaintiff "self discontinued Topamax since lack of clear benefits"); Tr. 225 (March 2013 notation of "partial" medication compliance and notation explaining Plaintiff's medications had been stolen); Tr. 269 (copy of Tr. 225); Tr. 274-75 (copy of Tr. 220-21). Thus, the ALJ cited only two records, one of which provides an explanation of something outside of Plaintiff's control for non-compliance. The remainder of the records indicate compliance with medications throughout the relevant time period. *See* Tr. 217, 222, 228, 231, 234, 276, 277, 278, 279, 281, 282, 288, 290, 292, 295, 297, 301, 303, 305, 307, 309, 311, 313, 325,

327, 329, 339). One record (or even two) of possible non-compliance simply cannot constitute substantial evidence in the face of this overwhelming evidence of compliance.

However, even eliminating this reason, the remainder of the reasons provided by the ALJ provide a sufficient basis for the ALJ's decision to discount Plaintiff's credibility. First, although the ALJ acknowledged that Plaintiff had chronic lower back pain, she pointed to an examination showing normal reflexes, ability to walk on heels and toes, and normal strength. (Tr. 18) (citing Tr. 254-55, 257). And, although at that same examination Dr. Assaf noted a reduced range of motion in Plaintiff's lumbar spine and a positive straight leg raising test (Tr. 255, 259), he also noted a normal gait, that Plaintiff needed no help getting on and off the exam table, and that she was able to rise from her chair without difficulty (Tr. 254). Other than evidence of medication prescriptions, there are no treatment records for Plaintiff's back impairment in the record. *See* Tr. 331-36; *see also* Tr. 47 (testimony that medication was the only treatment Plaintiff had recently received for her back impairment). While an ALJ cannot reject subjective reports of symptoms based solely on a lack of objective evidence, it is one factor that may be considered. *Kirkland v. Comm'r of Soc. Sec.*, 528 F. App'x 425, 427 (6th Cir. 2013) (finding no error where ALJ discredited claimant's testimony based on lack of objective medical evidence and medical opinion evidence). And, the ALJ cited Plaintiff's overall "conservative treatment". (Tr. 19). While the undersigned offers no opinion on whether treatment with methadone and oxycodone constitutes "conservative" treatment, the lack of additional evidence in the record of any different attempts at treatment, or any change in medication dosage over time, *see* Tr. 331-36, provides support for the ALJ's credibility determination that Plaintiff was not as limited as she alleged. *See also e.g.*, Tr. 252 ("She is uncooperative during the examination. She states that her illness is more mental than physical and that she does not understand why she had to come for this examination."). Moreover,

state agency physician Dr. Hinzman reviewed and specifically noted the positive findings from Dr. Assaf's examination, and still concluded Plaintiff was capable of medium exertional work as the ALJ ultimately found. *See* Tr. 85-86. The ALJ's decision to discount Plaintiff's allegations regarding her physical limitations is therefore supported by substantial evidence.

Second, the ALJ similarly relied on substantial evidence to find Plaintiff's allegations of the disabling effect of her mental impairments was not as extreme as she alleged. (Tr. 19). In support, the ALJ cited records that showed Plaintiff to be alert and oriented, with normal affect, good memory, good judgment, and no indication of paranoia; *Id.* (citing Tr. 246-47 (November 2013 psychological consultative examination); Tr. 255 (November 2013 physical consultative examination)). Additionally, the ALJ cited treatment notes indicating Plaintiff's condition was "stable". (Tr. 19) (citing Tr. 263 (January 2013); Tr. 266 (March 2013 notation that Plaintiff was "stable in spite of a lot of stress in her family")). Finally, the ALJ cited evidence that Plaintiff's medications were helping. *See* Tr. 19 (citing Tr. 276) (May 2013 note that "Trazadone has helped her sleep. Xanax is also working well."). These were proper credibility considerations. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F. App'x 272, 287 (6th Cir. 2009) (finding it appropriate to discount credibility when medical record showed claimant responded well to medications and therapy). Moreover, the undersigned notes Plaintiff herself reported to consultative examiner Dr. Assaf that her psychological "symptoms have improved on treatment". (Tr. 253).

Third, the ALJ cited Plaintiff's daily activities as supporting the decision to discount her credibility. (Tr. 19). The ALJ explained:

> For example, she reported being capable of performing housework, cleaning, doing laundry, reading, watching television, caring for minor child, driving, using public transportation, and shopping despite her symptoms.

(Tr. 19) (citing Tr. 183-86; 253). Plaintiff objects, contending the ALJ misconstrued the cited evidence. (Doc. 13, at 19-20). The cited records show Plaintiff reported making coffee, taking her medication, and getting her son up for school. *See* Tr. 183. She reported she would start to do dishes, but then her back would "go out". *Id.* In the same record, Plaintiff stated she did housework such as straightening the living room, and that she "tr[ied] to clean every day, but [she could not] . . . finish what [she] started." (Tr. 184). Plaintiff also reported preparing her own meals, including "cereal, sandwiches, pizza rolls, peanut butter sandwiches [and] pizza rolls." *Id.* Plaintiff also checked boxes indicating she drove a car and used public transportation, as well as grocery shopped two time per month for around two hours. (Tr. 185). And, under hobbies and interests, Plaintiff listed reading books and watching television (though she noted that the TV was on every day, but she did not watch it every day). (Tr. 186). In the other record cited by the ALJ—the report of the consultative examiner—the examiner noted Plaintiff reported cooking twice per week, cleaning once per week, doing laundry once per week, and shopping once per week. (Tr. 253). She also reported showering twice per week, dressing herself daily, and spending time watching television and listening to the radio. *Id.* Elsewhere in the record, Plaintiff reported being "able to complete chores and hygiene" and watching television and "occasionally" baking. (Tr. 247).

These reports stand in contrast to Plaintiff's allegation that she was completely disabled, and the ALJ did not err in considering them. Notably, the ALJ did not say that any of these activities, individually or in combination, equated with the ability to sustain full-time work, rather, that they showed she was less limited in her functional abilities than she alleged—a proper credibility consideration. *See Walters*, 127 F.3d at 532 (an ALJ may consider household activities in evaluating the credibility of the claimant's allegations of disabling symptoms); *see also Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2003) ("[T]he ALJ did not give undue

consideration to Temples' ability to performing day-to-day activities. Rather, the ALJ properly considered this ability as one factor in determining whether Temples' testimony was credible.").[12]

Based on the above, the undersigned therefore finds no "compelling reason" to disturb the ALJ's credibility determination, *Sims*, 406 F. App'x at 981, and finds it supported by substantial evidence.

RFC Determination

Plaintiff contends the ALJ erred in assessing her RFC. Specifically, Plaintiff argues the "ALJ's assessment that [Plaintiff] was capable of performing medium work is based on a selected reading of the evidence designed to fit the desired non-disability outcome." (Doc. 13, at 17). And, Plaintiff contends, due to this error, the ALJ's decision is not supported by substantial evidence, and therefore the ALJ's application of *Drummond*, 126 F.3d 387, was improper, as there was new and material evidence of worsening. *Id.* The Commissioner responds that the ALJ's RFC is supported by substantial evidence.

An individual's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 416.945(a)(1). In making this determination, the ALJ must consider all relevant evidence in the case record. *Id.*; SSR 96–8p, 1996 WL 374184, at *5. This evidence includes medical records, opinions of treating physicians, and the claimant's own description of his limitations. 20 C.F.R. § 416.945(a)(3). This includes consideration of the limiting effects of

_____

12. The undersigned does agree with Plaintiff that the ALJ's emphasis on Plaintiff's "ability to care for minor children" as being "quite demanding both physically and emotionally" (Tr. 19) as not the best reason for discounting Plaintiff's credibility, at least as it pertains to her physical abilities. In the cited record, Plaintiff reported caring for her son involved making sure he was up for school. (Tr. 183). Her son was fifteen years old at the time of the hearing. (Tr. 34). There is nothing in the record to suggest that caring for her son was physically demanding. However, even discounting this reason, the ALJ's decision to discount Plaintiff's credibility is still supported by substantial evidence in the record.

both severe and non-severe impairments. *Id.* § 416.945(e). The ALJ is required to evaluate every medical opinion received. *Id.* § 416.927(b). The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. § 416.946(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity.").

For the same reasons discussed above, and having reviewed the entire record, the undersigned finds no error in the ALJ's RFC determination. The ALJ considered all the evidence, and evaluated medical opinion as required by the regulations. And her decision was supported by substantial evidence. Although Plaintiff argues the ALJ "cherry-picked" the record, Plaintiff's argument ultimately represents a different view of the evidence, but does not undermine the substantial evidence in support of the decision. And, even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.The undersigned finds the ALJ's RFC—and determination to apply *Drummond*—was not error.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI supported by substantial evidence and affirms that decision.

 s/James R. Knepp II
United States Magistrate Judge

33